_____

### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | | |
|---|---|---|---|
| 1. | **ELIZABETH STEWART,** | ) | |
| | | ) | |
| | **Plaintiff,** | ) | |
| **v.** | | ) | **CIV-12-1297-C** |
| | | ) | |
| 1. | **STATE OF OKLAHOMA EX REL.,** | ) | |
| | **OKLAHOMA OFFICE OF** | ) | |
| | **JUVENILE AFFAIRS, et al.,** | ) | |
| | | ) | **ATTORNEY LIEN CLAIMED** |
| | **Defendants.** | ) | **JURY TRIAL DEMANDED** |

### PLAINTIFF'S RESPONSE TO DEFENDANTS'
### MOTION FOR SUMMARY JUDGMENT

_____

**RESPECTFULLY SUBMITTED THIS 27th DAY OF NOVEMBER, 2013.**

Submitted By:


**LEONARD & ASSOCIATES, P.L.L.C.**
**JANA B. LEONARD, OBA # 17844**
**EMILY VAN VOLKINBURG, OBA #31744**
**8265 S. WALKER**
**OKLAHOMA CITY, OK 73139**
**(405) 239-3800      TELEPHONE**
**(405) 239-3801      FACSIMILE**


**COUNSEL FOR THE PLAINTIFF**

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

**INDEX OF EXHIBITS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

**PLAINTIFF'S STATEMENT OF FACTS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**RESPONSE TO DEFENDANTS' STATEMENT OF FACTS**. . . . . . . . . . . . . . . . . 13

**ARGUMENT & AUTHORITIES**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**I.      STANDARD OF REVIEW**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**II.     STEWART'S RACE AND GENDER DISCRIMINATION CLAIMS**. . . . . . 20

**III.    RETALIATION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**IV.     STEWART'S DUE PROCESS CLAIMS**. . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*A.      Procedural Due Process (Property Interest)*. . . . . . . . . . . . . . . . . . . . . . . . 30

*B.      Substantive Due Process (Liberty Interest)*. . . . . . . . . . . . . . . . . . . . . . . . . 30

**V.      STEWART'S EQUAL PROTECTION CLAIM**. . . . . . . . . . . . . . . . . . . . . . 31

**VI.     CHRISTIAN IS NOT ENTITLED TO QUALIFIED IMMUNITY**. . . . . . . 31

**VII.    NEGLIGENT SUPERVISION, RETENTION AND TRAINING**. . . . . . . . . 32

**VIII.   BLACKLISTING CLAIM**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

**IX.     DEFENDANTS ARE NOT ENTITLED TO ABSOLUTE IMMUNITY**. . . . 33

**CONCLUSION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

**CERTIFICATE OF SERVICE**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

## TABLE OF AUTHORITIES

### UNITED STATES SUPREME COURT CASES:

*Cleveland Board of Educ. v. Loudermill*, 470 U.S. 532 (1985).. . . . . . . . . . . . . . . . . . . . 32

*Davis v. Passman*, 442 U.S. 228 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Sonnentheil v. Christian Moerlein Brewing Co.*, 172 U.S. 401 (1899). . . . . . . . . . . . . . 20

*Washington v. Davis*, 426 U.S. 229 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

### UNITED STATES CIRCUIT COURT CASES:

*Bailey v. Kirk*, 777 F.2d 567 (10th Cir.1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Barone v. United Airlines, Inc.*, 2009 WL 4547800 (10th Cir. Dec. 7, 2009). . . . . . . . . . 21

*Duncan v. Colo. Dept. of Corr.*, 2001 WL 863443 (10th Cir. 2001). . . . . . . . . . . . . . . . 20

*Floyd-Gimon v. Univ. of Arkansas*, 716 1141 (8th Cir. 2013). . . . . . . . . . . . . . . . . . . . 31

*Greene v. Barrett*, 174 F.3d 1136 (10th Cir. 1999).. . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Hom v. Squire*, 81 F.3d 969 (10th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303 (10th Cir. 2005). . . . . . . . . . . . . . . . . 21

*Jones v. Nordam Group, Inc.*, 2012 WL 4458379 (10th Cir. Sept. 27, 2012). . . . . . . . . . 29

*Jones v. Oklahoma City Pub. Sch.*, 617 F.3d 1273 (10th Cir. 2010). . . . . . . . . . . . . . . . 29

*Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220 (10th Cir.2000). . . . . . . . . . . . 20

*Morgan v. Hilti, Inc.*, 108 F.3d 1319 (10th Cir.1997). . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Murray v. Pizza Hut*, 92 F.3d 1996 (10th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Nguyen v. Gambro BCT, Inc.*, 2007 WL 1765518 (10th Cir. June 20, 2007).. . . . . . . 20, 28

*Perry v. Woodward*, 199 F.3d 1126 (10th Cir.1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Piercy v. Maketa*, 480 F.3d 1192 (10th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Pinkerton v. Colorado Dept. of Transp.*, 563 F.3d 1052 (10th Cir.2009). . . . . . . . . . . . 29

*Romero v. Union Pac. R.R.*, 615 F.2d 1303 (10th Cir. 1980). . . . . . . . . . . . . . . . . . . 28, 33

*Simms v. Oklahoma ex rel., Dep't of Mental Health & Substance Abuse Serv.*,
      165 F.3d 1321 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Stidham v. Peace Officer Standards and Training*,
      265 F.3d 1144 (10th Cir.2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Stinnett v. Safeway, Inc.*, 337 F.3d 1213 (10th Cir.2003). . . . . . . . . . . . . . . . . . . . . . . . 28

## STATE STATUTES:

10A O.S. §2-7-201(C)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

10A O.S. §2-7-202. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

40 O.S. §172. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

74 O.S. § 840-5.5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# <u>INDEX OF EXHIBITS</u>

Exhibit 1     Elizabeth Stewart Resume. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Exhibit 2     Gary Bolin Transcript. . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 4, 7, 8, 9, 10, 18

Exhibit 3     Elizabeth Stewart Employment Offer.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Exhibit 4     Gene Christian Transcript.. . . . 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 12, 14, 15, 17, 18

Exhibit 5     Elizabeth Stewart Transcrpt. . . . . . . . . . 1, 2, 4, 5, 9, 10, 14, 15, 17, 18, 19

Exhibit 6     Carol Miller Transcript. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 6, 7, 9, 10

Exhibit 7     Carey Rouse Transcript. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 5, 7, 8, 10

Exhibit 8     Mike Moriarty Declaration. . . . . . . . . . . . . . . . . . 2, 3, 4, 5, 6, 7, 14, 15, 16

Exhibit 9     Deanna Hartley-Kelso Transcript. . . . . . . . . . . . . . . . . . . . . . . . 2, 8, 10, 19

Exhibit 10    April 15, 2011 Board Minutes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Exhibit 11    June 17, 2011 Board Minutes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

Exhibit 12    Dusty Dowdle Transcript. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5, 9

Exhibit 13    August 2, 2011 Press Release. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Exhibit 14    September 29, 2011 Board Agenda. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Exhibit 15    2011 Board Retreat Agenda. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Exhibit 16    October 6, 2011 Board Minutes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Exhibit 17    2007 PMP. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Exhibit 18    2008 PMP. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Exhibit 19    2009 PMP. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Exhibit 20*      *2010 PMP.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *4*

*Exhibit 21*      *2011 PMP.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *4*

*Exhibit 22*      *Mike Heath Transcript..* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *5, 9, 10, 11, 13*

*Exhibit 23*      *October 1, 2006 Personnel Action Form..* . . . . . . . . . . . . . . . . . . . . . . . . *17*

*Exhibit 24*      *Elizabeth Stewart Declaration..* . . . . . . . . . . . . . . . . . . . . . *2, 5, 10, 13, 18, 19*

*Exhibit 25*      *Defendants' 2nd Supplemental Discovery Responses.* . . . . . . . . . . . *5, 7, 8, 9*

*Exhibit 26*      *October 27, 2011 Administrative Investigation Report, #1659.* . . . . . . . . . . *5*

*Exhibit 27*      *November 4, 2011 Criminal Investigation Report #1597.* . . . . . . . . . . . . . . *5*

*Exhibit 28*      *OJA Internal Investigative Referal Form #1386.* . . . . . . . . . . . . . . . . . . . . . *5*

*Exhibit 29*      *Criminal Investigation Report, #1395.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *5*

*Exhibit 30*      *Administrative Investigation Report, #1418-19..* . . . . . . . . . . . . . . . . . . . . . *6*

*Exhibit 31*      *Criminal Investigation Report #1623.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *6*

*Exhibit 32*      *11/3/11 Interview w/Parent, #1617.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *6*

*Exhibit 33*      *11/4/11 Criminal Investigation Report, #1597-99..* . . . . . . . . . . . . . . . . . . . . *6*

*Exhibit 34*      *Administrative Investigation Report, #1679.* . . . . . . . . . . . . . . . . . . . . . . . . *6*

*Exhibit 35*      *Administrative Investigation Report,*
                 *#1662, 1665, 1668, 1671, 1674, 1683-90.* . . . . . . . . . . . . . . . . . . . . . . . . . . . *6*

*Exhibit 36*      *Administrative Investigation Report, #1687.* . . . . . . . . . . . . . . . . . . . . . . . . *7*

*Exhibit 37*      *Administrative Investigation Report, #1689-90..* . . . . . . . . . . . . . . . . . . . . . *7*

*Exhibit 38*      *Janice Smith Transcript* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *7, 8, 9*

*Exhibit 39*      *December 14, 2012 Board Agenda.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *9*

*Exhibit 40*      *OJA document.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *9*

*Exhibit 41*      *Defendants' Bates No. 241.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *9*

*Exhibit 42*      *Plaintiff's Response to Int. No. 2.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *10*

*Exhibit 43*      *October 20, 2010 Stewart Email to Christian.* . . . . . . . . . . . . . . . . . . . . . *10*

*Exhibit 44*      *Laura Broyles Transcript, Volume I.* . . . . . . . . . . . . . . . . . . . . . . . . . *11, 12*

*Exhibit 45*      *Laura Broyles Transcript, Volume II.* . . . . . . . . . . . . . . . . . . . . . *11, 12, 13*

*Exhibit 46*      *Laura Broyles Order.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *11*

*Exhibit 47*      *May 9, 2011 Calendar Entry.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *13*

*Exhibit 48*      *June 8, 2005 Letter from Alexander Acosta to Governor Henry.* . . . . . . . . *14*

*Exhibit 49*      *September 9, 2008 Consent Decree.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *14*

*Exhibit 50*      *Department of Justice Complaint.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *14*

*Exhibit 51*      *June 19, 2007 OJA Press Release.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *14*

*Exhibit 52*      *April 7, 2009 OJA Press Release.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *14*

*Exhibit 53*      *September 21, 2011 Department of Justice Order.* . . . . . . . . . . . . . . . . . . *15*

*Exhibit 54*      *November 18, 2011 Department of Justice Order.* . . . . . . . . . . . . . . . . . . . *15*

*Exhibit 55*      *December 1, 2010 Oklahoman Article.* . . . . . . . . . . . . . . . . . . . . . . . . . . . *15*

*Exhibit 56*      *December 1, 2010 OPEA Article.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *15*

*Exhibit 57*      *December 2, 2010 OPEA Article.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *15*

*Exhibit 58*      *December 3, 2010 Enid News Article.* . . . . . . . . . . . . . . . . . . . . . . . . . . . *15*

*Exhibit 59*      *January 6, 2011 Article.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *15*

*Exhibit 60*      *October 4, 2011 Article.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *15*

*Exhibit 61*      *December 3, 2010 OPEA Article.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *15*

*Exhibit 62*      *November 21, 2011 Mike Moriarty Personnel Action.* . . . . . . . . . . *16, 17, 18*

*Exhibit 63*      *November 18, 2011 Elizabeth Stewart Personnel Action.* . . . . . . . *16, 17, 18*

*Exhibit 64*      *October 3, 2011 Article.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *17*

*Exhibit 65*      *July 26, 2007 Personnel Action.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *17*

*Exhibit 66*      *October 6, 2011 Article.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *17*

*Exhibit 67*      *July OHRM Position Request.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *17*

*Exhibit 68*      *October 20, 2010 Mike Moriaty PMP.* . . . . . . . . . . . . . . . . . . . . . . . . . *17*

*Exhibit 69*      *November 14, 2011 Letter.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *18*

*Exhibit 70*      *February 17, 2012 OJA Press Release.* . . . . . . . . . . . . . . . . . . . . . . . . . *19*

*Exhibit 71*      *September 26, 2011 OJA Press Release.* . . . . . . . . . . . . . . . . . . . . . . . . *6*

*Exhibit 72*      *Newspaper Article.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *17*

**COMES NOW** the Plaintiff, Elizabeth Stewart, in response to Defendants' Motion for Summary Judgment and states that the same should be denied, showing as follows:

## PLAINTIFF'S STATEMENT OF FACTS

1.      Elizabeth Stewart is a Black female with a Bachelor's in Social Work and a Master's in Human Relations.  She worked 18 years with the Department of Corrections and another 4 years at other correctional facilities.  *Ex. 1, Stewart Resume.*

2.      In mid-2004, Stewart interviewed with Gary Bolin (OJA Chief of Staff) to be the Rader Superintendent.  *Ex. 2, Bolin Tr., 5:16-17, 6:10-8:1.*  On August 19, 2004, she was offered the higher-level position of Division Administrator for Institutional Services Div. ("ISD") at OJA's State Office. *Ex. 2, 5:16-17, 6:10-8:1, 18:14-15; Ex. 3, Empl. Offer.*

3.      Bolin (White male) was Stewart's direct supervisor and the Executive Director ("ED"), Richard DeLaughter, was her second-level supervisor.  *Ex. 2, Bolin Tr., 8:2-8.*

4.      In Fall 2006, Gene Christian (White male) replaced DeLaughter.  *Ex. 4, Christian Tr., 7:24-8:4.*   Christian handled the "politics;"  Bolin handled day-to-day operations, including personnel matters (though Christian made the final decisions).  *Ex. 2, Bolin Tr., 13:4-17, 16:17-17:9; Ex. 5, Stewart Tr., 23:24-24:3; Ex. 6, Miller Tr., 61:5-24.*

5.      In Stewart's job, she had oversight responsibilities for three juvenile detention facilities ("facilities") - Rader (maximum security), COJC (medium security) and SWOJC (medium security) housing around 550 juveniles.  *Ex. 4, Christian Tr., 76:20-24; Ex. 5, Stewart Tr., 10:13-11:4; Ex. 6, Miller Tr., 32:12-14; Ex. 7, Rouse Tr., 33:25-34:2.*

6.     Christian made most decisions for the facilities, excluding Stewart from decisions she made before and causing her to just follow his directives. *Ex. 2, Bolin Tr., 24:23-25:6; Ex. 4, Christian Tr., 124:11-127:3; Ex. 5, Stewart Tr., 15:4-25; Ex. 8, M. Moriarty (MM) Decl, ¶7; Ex. 24, E. Stewart (ES) Decl., ¶¶1-4.*

7.     As explained by an OJA Board member, working at OJA is a "tough job;" "It's real easy to get bad press." *Ex. 9, Hartley-Kelso Tr., 24:25-25:12.*  Bolin concurred:

> The reality of it is, in an institution, you're always going to have those kinds of problems.  You do everything you can to avoid them, but the reality is, is that the juveniles that you're working with are going to create problems. That's why they're there in first place. *** I would tell you that working in an institution is not a fun job, nor is it an easy job.  And how you can control people depends on policy and procedure and what you're allowed to do.  So we're all restricted in some way by those things. *** And we were [] under a consent decree over at Rader, so there were a lot of issues about what we could and what we could not do. And [Stewart] was under the same restraints...

*Ex. 2, Bolin Tr., 19:4-20:4.  See also Ex. 4, Christian Tr., 52:17-21* (concurring).

8.     As of 2010, Christian had made the decision to close Rader due to pressure from the Senate (despite millions of tax dollars continuing to be spent on Rader for "improvements"). *Ex. 4, Christian Tr., 84:13-18; Ex. 8, MM Decl., ¶4.*  Yet, it was not until April 2011 that the decision was announced that Rader would close due to budget cuts, requiring the transfer of 51 youth to COJC and SWOJC. *Ex. 10, 4/15/11 Bd minutes, p.2.*

9.     Rader was the only maximum secure facility in Oklahoma and "more secure and safer" than COJC and SWOJC. *Ex. 11, 6/17/11 Bd min., p.2-3.*  "[COJC] looks like a day camp;" "It's a place that houses the worst of the worst juveniles with a fence around it."

*Ex. 12, Dowdle Tr., 14:25-15:2, 16:15-18.* And, under the *Terry D.* decision, staff were trained on their restrictions in restraining a juvenile (they could bear hug until he stopped struggling; then, they had to let go). This created a lot of difficulty in controlling the youth. *Ex. 4, Christian Tr., 55:11-23, 61:10-62:18; Ex. 8, MM Decl., ¶13.*

      10.    COJC cannot "lock down" juveniles. As explained to the Board in June 2011:

> the most violent, aggressive, combative and predatory juvenile offenders have always been transferred from COJC and [SWOJC] and placed at Rader, because Rader was the only facility that could secure, treat and rehabilitate the[se] juveniles in our state. Rader, and only Rader has that ability.*** Returning these violent maximum secure juveniles from Rader into medium secure facilities without having completed their treatment programs will result in other juveniles and staff being placed at risk of severe physical injury. *** If Rader is closed, sending these violent juvenile offenders to two medium secure facilities could result in serious problems for OJA...

*Ex. 11, 6/17/11 Bd min., p.2-3.* Christian admitted OJA had previously created much of the problem at Rader by placing the worst offenders there. *Ex. 4, Christian Tr., 76:15-77:18.*

      11.    The last youth was transferred out of Rader on August 1, 2011. *Ex. 13, 8/2/11 Press Release.* And, within a month, the Board had to meet to address ways to handle the increasing gang violence at COJC/SWOJC, like the use of chemical agents, tasers, restraints, hiring armed guards, and other means to enhance safety; initiatives that have to be approved by the ED. *Ex. 14, 9/29/11 Agenda; Ex. 12, Dowdle Tr., 18:17-21, 19:1-7.* The October 6, 2011 Board Retreat was slated to address the same issues. *Ex. 15, 2011 Agenda.*

      12.    Handling security, day-to-day facility operations, and training staff are the responsibility of the facility superintendent, his staff and OJA's Training Officer (Dave

Olberding - White male) - not Stewart.  *Ex. 5, Stewart Tr., 30:8-23; Ex. 4, Christian Tr.,*
*97:23-98:9, 104:22-106:19; Ex. 6, Miller Tr., 31:23-32:11; Ex. 8, MM Decl., ¶9.*

13.     Staffing the facilities was handled by HR and management at the facility and
HR at State office - not Stewart.  *Ex. 5, Stewart Tr., 22:8-15, 23:3-11; Ex. 4, Christian Tr.,*
*100:15-101:6, 102:11-21; Ex. 6, Miller Tr., 32:15-22; Ex. 8, MM Decl., ¶9.* Christian
exercised "great control" in allowing a job to be filled, and he had final approval on hiring
decisions. *Ex. 4, Christian Tr., 30:2-32:9, 33:20-24.*  Superintendents had to ask permission
from Christian to fill a vacancy. *Ex. 4, Christian Tr., 58:8-14.*  And, there were times when
Christian refused to fill vacancies.  *Ex. 5, Stewart Tr., 20:19-21; Ex. 8, MM Decl., ¶9.*

14.     Christian admitted there were a lot of job vacancies at COJC in 2011 and that
it was hard to fill those jobs. *Ex. 4, Christian Tr., 49:14-23, 57:20-58:7; Ex. 16, 10/6/11 Bd*
*minutes, p.5.*  He made pay decisions. *Ex. 16, at p.5.*  *See* 10A O.S. §2-7-201(C)(2).  The low
pay created a lack of qualified facility staff; "You get what you pay for." *Ex. 12, Dowdle Tr.,*
*14:15-24; Ex. 5, Stewart Tr., 21:3-22:7; Ex. 7, Rouse Tr., 40:13-42:5.*

15.     In spite of this, Stewart met or exceeded standards.  *Ex. 17, 2007 PMP; Ex. 18,*
*2008 PMP; Ex. 19, 2009 PMP; Ex. 20, 2010 PMP.*  Christian never voiced any concerns to
Bolin about her performance. *Ex. 2, Bolin Tr., 10:1-10.*  And, on September 20, 2011 (days
before her termination), Stewart "met standards" on her last PMP. *Ex. 21, 9/20/11 PMP.*

16.     Carol Miller worked under Stewart, describing her as an "awesome" supervisor
who was very effective. *Ex. 6, Miller Tr.,  5:15-18, 6:1-4, 22:9-24, 23:14-17, 18:25-20:8.*

-4-

17.     Superintendent Mike Moriarty said she had high standards and did what she could to ensure efficiency and safety at the facilities.  *Ex. 8, MM Decl., ¶¶8, 10.*

18.     Mike Heath, the Administrator of OJA's Office of Public Integrity, said she did a good job. *Ex. 22, Heath Tr., 5:8-23, 7:25-8:4.*  Heath's office investigates juvenile-on-staff assaults, juvenile-on-juvenile aggravated assaults, staff-on-juvenile assaults, and the negligence/poor performance of staff.  *Ex. 22, Heath Tr., 38:10-40:7; Ex. 12, Dowdle Tr., 6:4-11.*  And, none of the hundreds, if not thousands, of his office's investigations involved her. *Ex. 7, Rouse Tr., 13:19-23; Ex. 22, Heath Tr., 21:2-9; Ex. 12, Dowdle Tr., 11:7-10.*

19.     However, on or about October 3, 2011, Christian put Stewart on leave, saying she could resign or be fired.  He refused to give her a reason or a hearing, saying she was at-will. *Ex. 5, Stewart Tr., 57:5-16, 57:24-58:3; Ex. 24, ES Decl., ¶19; Ex. 25, RFA No. 15.*

20.     In his deposition, Christian claimed that her termination was due to three events at COJC: (1) a youth-on-youth assault, (2) a gym event, and (3) an escape. *Ex. 4, Christian Tr., 47:23-49:5.*  Yet, he made no mention of the August 4, 2011 assault in her PMP (signed 9/20/11). *Ex. 21; Ex. 4, Christian Tr., 94:23-96:4.*  And, OJA's investigations into the gym event and escape were not completed when he fired her on October 3, 2011. *Ex. 26, 10/27/11 Admin. Invest. Rpt (AIR), #1659; Ex. 27, 11/4/11 Crim. Inv. Rpt (CIR), #1597.*

21.     The assault occurred on 8/4/11 when a 17-year-old attacked a youth (age 16) at night. *Ex. 28, #1386.*  They both had just transferred in mid-July 2011 from Rader where the youth are locked up at night. *Ex. 29, CIR, #1395; Ex. 4, Christian Tr., 49:24-50:23.*

22.     Although Christian claims to hold Stewart responsible for this assault, all COJC staff were found to have followed policy. *Ex. 30, AIR, #1418-19.*

23.     When the gang-related gym event occurred, without knowing the details, one staff said to call the police.[1] *Ex. 31, CIR #1623; Ex. 32, 11/3/11 Interview w/Parent, #1617.*

24.     When asked what Stewart could have done to prevent the event, Christian nonsensically stated, "I do not know what she knew." *Ex. 4, Christian Tr., 107:21-108:2.* When asked generally what could have been done, he testified that the COJC staff "did not perform their tasks as designated by their supervision." *Ex. 4, Christian Tr., 107:3-20.*

25.     Yet, staff were found to have acted properly. *Ex. 33, 11/4/11 CIR, #1597-99.*

26.     Although Christian allegedly held Stewart accountable for the assault and the gym event after-the-fact, when they occurred, Christian did not find the events significant enough to even discuss them with her. *Ex. 4, Christian Tr., 108:10-109:4.*

27.     When the escape occurred, 8 to 10 youth were being escorted to med call by COJC staff at night. *Ex. 34, AIR, #1679; Ex. 6, Miller Tr., 36:14-37:13, 44:10-14; Ex. 8, MM Decl., ¶11.* Five COJC staff (three had worked at COJC seven months or less) were investigated after three youth slipped through a door and climbed over the fence via stacked trash cans. *Ex. 35, AIR, #1662, 1665, 1668, 1671, 1674, 1683-90; Ex. 6, Miller Tr., 36:14-37:13, 44:10-14.* OJA's investigatory report of these five COJC staff cited that "[d]ue

---

[1]Police are called at times because they can use weapons and restraints that OJA staff cannot. *Ex. 4, Christian Tr., 60:3-61:9, 63:13-21; Ex. 71, 9/26/11 Press Release.*

diligence was sacrificed for expediency." *Ex. 36, AIR, #1687.*

28.    No COJC employee involved in these events was fired and only a few (with

the escape) were disciplined.  *Ex. 6, Miller Tr., 37:14-38:19, 47:6-14, 54:21-25; Ex. 8, MM*

*Decl., ¶13.*

29.    When asked what Stewart could have done to prevent the escape, Christian

identified nothing, but stated that COJC staff should have done their jobs.  *Ex. 4, Christian*

*Tr., 114:17-21.* Yet, Stewart did not work at COJC and was not charged with directing or

training COJC staff in their duties.  *See Plt's Statement of Fact ("PSOF") Nos. 12-14.*  The

investigation did not point to any wrongdoing on the part of Stewart.  *Ex. 37, AIR, #1689-90.*

30.    Moriarty and others stated that these events were common; Stewart was "far

removed" from them; and she could do nothing to prevent them.  *Ex. 8, MM Decl., ¶9; Ex.*

*6, Miller Tr., 22:9-24, 54:10-20; Ex. 7, Rouse Tr., 43:22-44:1; Ex. 38, Smith Tr., 23:21-25.*

31.    When Christian was asked what <u>he</u> could have done to prevent these events,

Christian identified nothing, merely deflecting responsibility.  *Ex. 4, Christian Tr., 96:23-*

*97:8.*  However, Christian was admittedly responsible for everything that happened at the

facilities, including the events at COJC.  *Ex. 4, Christian Tr., 96:16-22.*  Bolin was also

responsible for these events and had admitted responsibility for all personnel decisions. Yet,

neither were disciplined.  *Ex. 2, Bolin Tr., 13:4-14:9; Ex. 4, Christian Tr., 97:9-22.*

32.    OJA's discovery responses identify Bolin as a "participant" in Stewart's

termination decision. *Ex. 25, Int. No. 5.*  Yet, Bolin, who handled OJA's personnel decisions

for six years, testified he would <u>not</u> have fired her and had <u>no</u> involvement in the firing. *Ex. 2, Bolin Tr., 10:17-22, 14:10-17, 16:13-20, 18:5-8.* In fact, after he learned of the decision, he fought to keep Stewart. *Ex. 2, Bolin Tr., 15:1-2.* The discovery response is also contrary to Christian's admission in his deposition that he was the sole decision-maker and that he did not consult with anyone. *Ex. 4, Christian Tr., 47:15-22; Ex. 25, Int. No. 5.*

33.     Despite Christian's deposition testimony, he led many to believe the Board was involved in or made the decision. *Ex. 7, Rouse Tr., 28:19-29:4; Ex. 2, Bolin Tr., 11:8-12:5, 12:14-13:3.* When Bolin suggested transfer, etc., Christian stated, "It's the Board's decision and I don't have any opportunity to do anything else." *Ex. 2, Bolin Tr., 15:13-20.*

34.     Yet, Bolin attended the Board meetings and never heard the Board ask for anyone to be fired over the events at Rader or COJC. *Ex. 2, Bolin Tr., 20:21-21:9.* In fact, Board member Janice Smith admitted the Board plays no role in hiring or firing decisions (other than to interview for the ED position). *Ex. 38, Smith Tr., 5:22-25, 12:1-13, 28:3-10.*

35.     Board member Deanna Hartley-Kelso stated there had been no discussion about removing Stewart nor had she ever expressed to anyone that Stewart should be fired or relieved of duty. *Ex. 9, Hartley-Kelso Tr., 8:24-9:12, 21:7-12, 25:17-23.* Rather, Hartley-Kelso and Smith testified that Christian (who led the Board to believe that Stewart worked at COJC) simply notified the Board that Stewart had been fired. *Ex. 9, Hartley-Kelso Tr., 18:22-19:21 , 20:12-17; Ex. 38, Smith Tr., 16:9-25, 20:1-5, 20:24-21:24, 22:7-19, 23:6-9.*

36.     Bolin testified that following Stewart's firing, he knew of no changes that were

made at the facilities to prevent these events from happening. *Ex. 2, Bolin Tr., 24:16-22.*

37.     Although Miller testified that staffing has since increased at the facilities and the number of youth housed in the facilities has gone down, the number of criminal incidents have "drastically went up" (170 conducted between January 2013 and October 2013). *Ex. 6, Miller Tr., 32:23-33:5, 55:1-5, 59:5-11, 62:21-63:25, 68:10-16; Ex. 12, Dowdle Tr., 6:17-21; Ex. 22, Heath Tr.,42:1-13; Ex. 38, Smith Tr., 33:16-22.* And, in December 2012 (a year after Stewart's termination), there were nine (9) confirmed allegations of abuse, neglect or mistreatment at the facilities. *Ex. 39, 12/14/12 Agenda.*

38.     No one was fired after an escape at SWOJC post-October 2011. *Ex. 6, Miller Tr., 62:2-12, 64:1-13; Ex. 22, Heath Tr., 31:19-21.* And, there were six (6) escapes from OJA secure facilities in 2012. *Ex. 40, OJA document.*

39.     Christian engages in racism and sexism.[2] *Ex. 5, Stewart Tr., 66:7-68:13.*

40.     In addition to the above, Christian replaced Stewart with Dick Parrish (White male). *Ex. 41, Def Bates No. 241; Ex. 25, Int. No. 4.*

41.     Since 2008, Stewart was the only Black Division Director at OJA and one of only three female Division Directors (Stewart, Kim Sardis and Shantha Varahan). Stewart and Sardis were hired before Christian became the ED. None of the three (3) work for OJA now, and Christian replaced each with White males. *Ex. 41, Def Bates No. 241.* Under

---

[2]Christian had also fired a Black female, Martha Oakes, when he was the District Attorney in Grady County, telling her that being in the courtroom was not her forte. She is now a Special Judge in Oklahoma County. *Ex. 4, Christian Tr., 133:13-134:12.*

Christian, since Stewart's firing, there are no executive staff who are Black. *Ex. 6, Miller Tr., 65:5-11.*

42.     One of Christian's first actions taken as ED was to fire an upper-level female employee. *Ex. 2, Bolin Tr., 17:14-22.* And, Christian personally hired three White males as criminal investigators: Carey Rouse, Jimmy Richey, and Dusty Dowdle. *Ex. 7, Rouse Tr., 5:11-22, 20:13-23:2, 44:2-5; Ex. 22, Heath Tr., 31:22-32:16, 41:6-25.* And, Christian was the final decision-maker in placing Mike Moriarty (White male) as COJC's Superintendent. *Ex. 4, Christian Tr., 126:21-127:3; Ex. 42, Plt's Resp., Int. No. 2.*

43.     At a Board retreat, Stewart was sitting with staff and Board members Hartley-Kelso and Smith, discussing Halloween. Linda McLennan (Christian's Executive Assistant) told the group about a Halloween when she (as a teenager) and her friends dressed up as the KKK. One of the friends put on a black face with a noose. *Ex. 43, Email; Ex. 5, Stewart Tr., 42:7-43:7; Ex. 2, Bolin Tr., 23:13-16; Ex. 4, Christian Tr., 117:2-9.*

44.     Stewart (the only Black person at the table) was insulted and visibly shocked. *Ex. 5, Stewart Tr., 44:3-6; Ex. 9, Hartley-Kelso Tr., 16:12-17.* She complained to Christian, who admits others found the story inappropriate. *Ex. 4, Christian Tr., 116:18-23; Ex. 43.*

45.     Stewart told Christian some discipline/sensitivity training needed to be issued, but he merely asked McLennan (who admitted to the story) to apologize. *Ex. 4, Christian Tr., 120:14-121:1; Ex. 5, Stewart Tr., 48:17-49:5.* Yet, Christian retaliated against Stewart by excluding her from decisions she should have been involved in. *Ex. 24, ES Decl., ¶4.*

-10-

46.     Although Heath's office is charged with investigating EEO complaints, no investigation was done as to the KKK story. *Ex. 22, Heath Tr., 5:8-23, 27:14-28:2.*

47.     While Christian was ED, Heath investigated 4 to 5 EEO complaints (some race and gender) per year (some substantiated). *Ex. 22, Heath Tr., 23:3-9, 24:3-15, 25:4-12.*

48.     Laura Broyles (hired 1999; Program Manager since 2004), lodged two gender complaints to Heath about Christian. *Ex. 44, Broyles Tr., Vol. I, 5:17-6:1, 10:4-6.*

49.     Broyles complained about a sexual comment Christian made to her when she took a travel claim for a legislator to Christian. *Ex. 22, Heath Tr., 32:20-33:10, 34:6-35:8.* Christian flippantly said that if she would "just sleep with him [the legislator], then it would fix the budget problems." *Ex. 44, Broyles Tr., Vol. I, 17:9-24; Ex. 45, Broyles Tr., Vol. II, 56:16-57:5; Ex. 22, Heath Tr., 34:10-35:2.* Christian admitted to this. *Ex. 22, Heath Tr., 45:17-23.* Broyles was very upset and uncomfortable. Co-workers who were present started laughing at Christian's comment. *Ex. 44, Broyles Tr., Vol. I, 17:25-18:3.*

50.     Heath had also investigated a gender discrimination complaint Broyles lodged against Christian (where she was the only female of three positions and was receiving less pay than the two males). *Ex. 44, Broyles Tr., Vol. I, 18:17-20; Ex. 45, Broyles Tr, Vol II.,34:4-35:12, 38:1-13, 39:18-23, 47:7-25.* Although Heath testified he issued a finding of no discrimination, Heath did recommend that she receive a slight increase in pay. *Ex. 22, Heath Tr., 42:16-44:8; Ex. 46, Broyles Order; Ex. 45, Broyles Tr., Vol. II, 39:18-40:20.*

51.     Broyles appealed Heath's decision to Christian who denied the claim

altogether. *Ex. 45, Broyles Tr., Vol. II, 40:24-41:21.* However, the Merit Protection Commission reversed. *Ex. 45, Broyles Tr., Vol. II,42:24-43:2.* And, the Administrative Law Judge found there was gender discrimination in the disparity in pay. *Ex.46, Broyles Order.*

52.     Broyles also filed gender discrimination and equal pay claims with the EEOC. The EEOC found cause and entered into a conciliation agreement in December 2011. *Ex. 45, Broyles Tr., Vol. II, 50:12-52:1.* As such, OJA has been under EEOC oversight and was required to train all supervisors by January 2014. *Ex. 45, Broyles Tr., Vol. II, 51:3-11.* As of November 2013, OJA has not met that requirement. *Ex. 45, Broyles Tr., Vol. II, 51:3-11.*

53.     Broyles suffered retaliation in that she was excluded from meetings and co-workers were told not to speak to her. *Ex. 45, Broyles Tr., Vol. II, 53:1-8.*

54.     Broyles testified that Christian did not treat female employees in the same manner as males. For instance, like Stewart, Christian excluded Broyles from meetings and decisions that, as part of her job, she should have been involved in. *Ex. 45, Broyles Tr., Vol. II, 55:15-56:5.* Christian also considered Broyles' input only as an afterthought because she is female. *Ex. 45, Broyles Tr., Vol. II, 56:16-22.* Broyles' experience with Christian was that he did not like assertive women in the workplace. *Ex. 45, Broyles Tr., Vol. II, 58:1-6.*

55.     Broyles' direct supervisor, Anna Kelly, was supportive of Broyles' complaints.[3] Broyles believed there were gender issues Kelly had personally experienced at OJA that

---

[3]Anna Kelly was a Program Manager IV who ultimately reported to the Division Administrator Dennis Gober (White male who was hired by Christian). *Ex. 44, Broyles Tr., Vol. I, 10:24-11:10; Ex. 4, Christian Tr., 20:8-14, 29:3-4.*

made Kelly more supportive of such efforts.  *Ex. 45, Broyles Tr., Vol. II, 62:2-9.*  In fact, Christian's personal calendar notes that May 9, 2011 was Christian's deadline to respond to the second step of a grievance filed by Kelly.[4]  *Ex. 47, 5/9/11 Calendar entry.*

56.     Broyles also witnessed OJA presenting a highly inappropriate video to staff (with Christian present), depicting women sitting at a bar where it appeared the women had no pants on or a thong on.  *Ex. 45, Broyles Tr., Vol. II, 63:3-22.*

57.     Broyles also witnessed racial issues at OJA in that Christian showed a total disregard for equal racial treatment for youth and paid no regard to racial statistics of Black youth in the system.  *Ex. 45, Broyles Tr., Vol. II, 64:21-66:25.*  And, OJA put on an inappropriate skit for its employees (with Christian present) where staff were mocking a person with a strong Indian accent.  *Ex. 45, Broyles Tr., Vol. II, 62:10-63:2, 64:3-13.*

58.     OJA has no mandatory discrimination training; Christian placed no emphasis on such training during his tenure.  *Ex. 22, Heath Tr., 47:8-48:11.*  And, Stewart does not recall EEO training even being part of orientation.  *Ex. 24, ES Decl., ¶16.*

## RESPONSE TO DEFENDANTS' STATEMENT OF FACTS[5]

**RESPONSE TO 1-2**: Admitted in part, that the events occurred.  However, these events happen all the time.  *See PSOF Nos. 7, 9, 10, 11, 30, 37, 38.*

---

[4]Stewart has a Motion to Compel pending as to these complaints. [Doc. No. 28].

[5]Defendants violated LCvR 56.1(b) by not numbering their facts.  Plaintiff has responded to each sentence of their Statement of Facts.  They also sprinkled more facts in their brief, again in violation.  As such, those facts should not be considered.

-13-

**RESP. TO 3**: Denied.  Christian and Bolin (White males) were over the facilities; Stewart provided oversight.  *See PSOF Nos. 4, 5, 6, 31, 32.*  Each Superintendent was in charge of his facility.  *See PSOF Nos. 12, 13, 30.*  Stewart did not work at COJC and did not control its daily functions or its staff.  *Ex. 8, MM Decl., ¶9.*

**RESP. TO 4**: Admitted.  Christian admitted COJC "was [Moriarty's] responsibility." *Ex. 4, Christian Tr., 49:6-13. See also Ex. 8, MM Decl., ¶9.*

**RESP. TO 5**: Denied.  There is no evidence that these events complicated an attempt to end a lawsuit.  Prior to Stewart's firing, Rader had closed and the youth had transferred. *See PSOF Nos. 8-11.*  As Christian admitted, the "lawsuit" (*U.S. v. Oklahoma, et al.*, CIV-06-673-GKF-FHM (N.D. Okla.)("DOJ case")) related to events that arose <u>before</u> August 2004 when Stewart was hired.  *Ex. 48, 6/8/05 Ltr fr Acosta; Ex. 49, Consent Decree; Ex. 4, Christian Tr., 74:18-75:16.*  OJA was already talking to the DOJ about issues at Rader when Stewart was hired.  *Ex. 5, Stewart Tr., 12:6-16.*  While Christian and Jimmy Martin (Rader Superintendent) were personally named in the DOJ case, Stewart was not.  *Ex. 50, DOJ Complaint.*  And, though Martin (White male) was Rader's Superintendent prior to and during the DOJ case, he resigned with a glowing send-off from Christian.  *Ex. 51, 6/19/07 Press Release.*  Martin was replaced by Everett Gomez (Hispanic male) who then retired in 2009.  *Ex. 52, 4/7/09 Press Release.*  Christian and Bolin then placed Moriarty as Rader's Superintendent until 2010, when he was transferred to COJC.  *Ex. 8, MM Decl., ¶¶5, 6.*  In the DOJ case, the parties entered into a 3-year Consent Decree on 9/9/08.  *Ex. 49, Consent*

-14-

*Decree*.  On 9/9/11, the Consent Decree expired.  On 9/21/11 (before Stewart's firing), the court declined to extend the Decree.  *Ex. 53, Order.*  Shortly thereafter, the DOJ case was dismissed without the DOJ even responding to a motion to dismiss.  *Ex. 54, 11/18/11 Order.*

**RESP. TO 6**: Denied.  He did not "warn" Stewart.  He simply stated that when Rader closed, the press would focus on COJC.  *Ex. 4, Christian Tr., 73:20-74:9; Ex. 5, Stewart Tr., 17:22-18:9.*  He was well aware of the problems he created at COJC with closing Rader, but did nothing to fix them.  *Ex. 4, Christian Tr., 73:20-74:9; Ex. 8, MM Decl., ¶13.*

**RESP. TO 7**: Admitted in part.  OJA receives "bad press" all the time.  *See PSOF No. 7.*  It received "bad press" over the DOJ case, but no one was fired over that.  *See Resp. to Def's Stmt of Fact ("DSOF") No. 5.*  Christian was not fired when he and OJA received "bad press" when he awarded a bid for a new facility in Ada to a company whose lobbyist was having an affair with a State Senator.  *Ex. 55, 12/1/10 Oklahoman Article; Ex. 56, 12/2/10 OPEA Article; Ex. 57, 12/2/10 OPEA Article; Ex. 58, 12/3/10 Enid News Article; Ex. 59, 1/6/11 Article; Ex. 60, 10/4/11 Article.*  OJA and Christian came under investigation for his involvement in the scandal and alleged bid-rigging, and the funding was pulled.  *Ex. 4, Christian Tr., 85:14-86:8; Ex. 61, 12/3/10 OPEA Article.*  Christian knew COJC was going to receive the focus of the press after Rader closed, as violent offenders moved to COJC, yet he did nothing to remedy the issues.  *Ex. 4, Christian Tr., 73:20-74:9; Ex. 8, MM Decl., ¶13.*

**RESP. TO 8**: Denied.  Events occurred all the time and OJA received press, yet no one was fired.  *See Resp. to DSOF Nos. 1-5.*  The investigations into the gym event and

escape had not been completed when he fired Stewart.  *See PSOF No. 20.*  And, although Rader was receiving bad press and was in the middle of a lawsuit with the DOJ, none of the Superintendents at Rader were fired.  *See Resp. To DSOF Nos. 5, 7.*

<u>**RESP. TO 9**</u>: Denied.  The day after the escape, Christian asked Moriarty what could be done to assist him at COJC, meaning Christian did not intend to fire Moriarty, but to help him.  *Ex. 8, MM Decl., ¶12.*  Christian confirmed this when he told Moriarty, "it looks like you are going to get a new division administrator."  *Id.*  Moriarty then asked Christian if he wanted his resignation to which Christian did not respond.  *Id.*  Christian then returned to Moriarty's office and told him he was being put on leave.  *Id.*  <u>A few weeks later</u>, Moriarty was told for the first time he could resign, retire or be fired.  *Id.*  Moriarty questions the true intent behind such offer.  *Id., at ¶14.*  Moriarty's Personnel Action Form identifies "personnel action requested" as "retirement" and "action code/ reason" as "retirement."  *Ex. 62, 11/21/11 MM PAF.*  Yet, Stewart's form identifies "action requested" as "termination" and "action code/reason" as "resignation."  *Ex. 63, 11/18/11 ES PAF.*  Christian, Bolin, Dave Olberding and staff at COJC were not held to the same standard as Stewart in regard to these events.  *See Resp. to DSOF Nos. 3-6, PSOF No. 12-13, 28, 31.*  No one can identify how Stewart was responsible or what she could have done to prevent them.  *See PSOF Nos. 24, 29.*  Also, Christian knew of the 8/4/11 assault as of September 20, 2011 when he signed Stewart's PMP, and mentioned nothing of the assault.  *See PSOF Nos. 15, 20.*

<u>**RESP. TO 10**</u>: Admitted that Stewart used her accumulated leave while making her

decision.  *Ex. 4, Christian Tr., 69:24-70:23.  See also Resp. To DSOF No. 9.*

**RESP. TO 11**: Admitted in part.  However, Stewart was on leave and was told she had to choose between resignation or termination.  *See PSOF No. 10.*  Christiansen told the press that Stewart had "taken annual leave so that legal issues can be addressed."  *Ex. 64, 10/3/11 Article; Ex. 66, 10/6/11 Article*.  These statements were false and made it appear she had not performed her job and that she was solely responsible.  *Ex. 5, Stewart Tr., 64:14-22, 65:17-21, 69:13-22; Ex. 72, Article; Ex. 4, Christian Tr., 130:30-16.*

**RESP. TO 12**: Admitted in part. Bolin completed the reviews for Stewart, and Christian merely signed off on them.  *Ex. 4, Christian Tr., 82:6-16.*  The only two raises she received under Christian were market adjustments.  *Ex. 65, 7/26/07 PAF; Ex. 23, 10/1/06 PAF*.  And, though the State average for Stewart's level was $6,343.58 in 2007, she was earning $5,958.75.  The market adjustment only raised her to $6,042.08.  *Ex. 65, 7/26/07 Pers. Action; Ex. 67, July OHRM Pos. Req.*  Moriarty was earning nearly the same as Stewart despite her added duties.  *Ex. 62, 11/21/11 MM PAF; Ex. 63, 11/18/11 ES PAF.*

**RESP. TO 13-14**: Admitted; Christian signed Moriarty's.  *Ex. 68, MM 2010 PMP*.

**RESP. TO 15**: Denied.  It is unclear what Defendants mean by "institutionalized population had been reduced."  Rader had been closed, but COJC had added Rader's youth.  *See PSOF Nos. 8, 11*.  Christian testified that he was not aware of any employee morale issues at that time.  *Ex. 4, Christian Tr., 104:14-17*.  To the extent there are morale issues, they are based on lack of pay and the inability to control the youth due to *Terry D*.  *Ex. 5,*

-17-

*Stewart Tr., 24:21-25:5; Ex. 24, ES Decl., ¶¶17-18.  See also PSOF Nos. 9-11, 14.*  Christian admitted COJC was understaffed.  *See PSOF Nos. 13-14.*  Positions were not approved until after Stewart's termination.  *See PSOF No. 37.*  Christian mentioned nothing of morale, retention or management issues in Stewart's September 20, 2011 PMP.  *Ex. 21.*

**RESP. TO 16-18**: Denied.  Christian did not consider a demotion for Stewart,  and although he had jobs available, he failed to identify a single job he actually considered for Stewart as a "transfer."  *Ex. 5, Christian Tr., 127:4-130:2.*  When Bolin asked about any other option, Christian falsely stated, "It's the Board's decision and I don't have any opportunity to do anything else."  *Ex. 2, Bolin Tr., 15:13-20.  And s*ee *Resp. to DSOF No. 9.*

**RESP. TO 19**: Admitted in part, that she used her leave.  However, Defendants have provided no evidence that Stewart used more leave than the "normal maximum allowed."  In fact, her final day is noted as December 1, 2011 - the same as Moriarty.  *Ex. 62, 11/21/11 Moriarty Pers. Action*; *Ex. 63, 11/18/11 Stewart Pers. Action*.  And, Christian required her to use her accrued comp and leave time from October 3, 2011 to December 1, 2011 while she was making her decision.  *Ex. 5, Stewart Tr., 54:23-25, 60:22-61:10; Ex. 4, Christian Tr., 69:24-70:23*.  Stewart "labored long and hard" over the options Christian presented to her and she tendered her resignation "under duress".  *Ex. 69, 11/14/11 Letter.*  She did not want the stigma of being fired from a job.  *Ex. 5, Stewart Tr., 61:3-14.*

**RESP. TO 20**: Denied that Stewart was at-will as shown below.

**RESP. TO 21-22**: Admitted.

-18-

**RESP. TO 23**: Admitted in part.  They dressed as the KKK.  *See PSOF No. 43*.

**RESP. TO 24-25**: Admitted, that the events happened in October and that McLennan was not disciplined.  *See PSOF No. 45*.

**RESP. TO 26**: Admitted in part, but Hartley-Kelso testified that her mouth was open in shock and Stewart was also visibly shocked.  *Ex. 9, Hartley-Kelso Tr., 15:22-16:17*.

**RESP. TO 27**: Admitted that Stewart was "terminated" in October 2011.

**RESP. TO 28**: Denied. When Christian excluded Stewart from decisions, she asked Bolin if it was because of her race and he did not deny it.  *Ex. 24, ES Decl., ¶6*.

**RESP. TO 29**: Admitted in part.  He announced his retirement on February 17, 2012, stating, "Our employees have been challenged with reductions in staff and budget cuts. Regardless of those challenges, they have been diligent and determined in their care for the youth [], while [] achieving successful results."  *Ex. 70, 2/17/12 Press Release*.

**RESP. TO 30**: Admitted in part.  Stewart applied for many jobs, some with other state agencies, and was not offered any of the positions for which she applied.  *Ex. 5, Stewart Tr., 62:8-64:6; Ex. 24, ES Decl., ¶7-13.  See also Resp. To DSOF No. 11*.

## ARGUMENT & AUTHORITIES

### I.   STANDARD OF REVIEW.

All evidence must be considered in the light most favorable to Stewart.  *Hom v. Squire*, 81 F.3d 969, 973 (10th Cir. 1996).  Christian's self-serving statements unsupported by contemporaneous records are insufficient to sustain summary judgment because "the mere

fact that the witness is interested in the result of the suit is deemed sufficient to require the credibility of his testimony to be submitted to the jury." *Sonnentheil v. Christian Moerlein Brewing Co.*, 172 U.S. 401, 408 (1899). And, "it is the sole province of the jury to appraise credibility, draw inferences, determine the weight to be given testimony and to resolve conflicts in the facts." *Duncan v. Colo. Dept. of Corr.*, 2001 WL 863443, *2 (10th Cir. 2001).

## II.    STEWART'S RACE AND GENDER DISCRIMINATION CLAIMS[6]

Defendants set forth the wrong *prima facie* case, claiming Stewart must show "similarly situated employees outside the protected group were treated more favorably under comparable circumstances." Such a notion was specifically rejected by the Tenth Circuit in *Nguyen v. Gambro BCT, Inc.*, 2007 WL 1765518, *4 (10th Cir. June 20, 2007):

> Our case law is clear: To establish a prima facie case of discriminatory termination in violation of Title VII, a plaintiff "need only show that: (1) he belongs to a protected class; (2) he was qualified for his job; (3) despite his qualifications, he was discharged; and (4) the job was not eliminated after his discharge." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1229 (10th Cir.2000) (citing *Perry v. Woodward*, 199 F.3d 1126, 1138 (10th Cir.1999)). We held in *Kendrick* that the lower court committed error "in requiring [plaintiff] to show that [the employer] treated similarly-situated nonminority employees differently in order to [establish a prima facie case]." *Id* .

Hence, Stewart (a Black female) need only show she was qualified for her job, she was discharged, and her job was not eliminated. The only element in dispute is whether she was discharged. And, although Defendants spend a considerable amount of time arguing she

---

[6]Title VII and § 1981 race claims are viewed under the same standards. And, although Defendants argue a HWE claim, no such claim has been asserted.

"resigned," nothing could be further from the truth.  Christian placed Stewart on leave, telling her she could resign or be fired.  Maintaining her job was not an option.  Defendants admit she was "terminated."  *See DSOF No. 27*.  Her PAF identifies "action requested" as "termination."  Her decision was made under duress.  And, OJA informed the press that she was "relieved of her duties."  There is simply no question she was fired.[7]

Pretext may be established by showing weaknesses or implausibilities in the proffered reason such that a factfinder could find them unworthy of belief and infer that the employer did not act for that reason. *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997).  And, as explained in *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1310 (10th Cir. 2005):

> a successful attack on part of the employer's [] explanation is enough to survive summary judgment even if one or more of the [] reasons has not been discredited. Something less than total failure of the employer's defense is sufficient to create a genuine issue of fact when (1) the reasons are so intertwined that a showing of pretext as to one raises a [] question whether the remaining reason is valid; (2) the pretextual character of one explanation is so "fishy and suspicious," that a jury could "find that the employer (or its decision maker) lacks all credibility; (3) the  employer offers a plethora of reasons and the plaintiff raises substantial doubt about a number of them; (4) the plaintiff discredits each of the employer's objective explanations, leaving only subjective reasons to justify its decision; or (5) the employer has changed its explanation under circumstances that suggest dishonesty or bad faith.

Here, Christian's after-the-fact subjective reason for termination is "fishy and

---

[7]See *Barone v. United Airlines, Inc.*, 2009 WL 4547800, *10 (10th Cir. Dec. 7, 2009) (finding adverse action when employer presented two undesirable options which would alter her "compensation, terms, conditions, [and] privileges of employment").

suspicious" and riddled with weaknesses and implausibilities.[8]  First, the assault occurred

within one month of two teenage violent offenders being transferred to COJC (medium

secure) because <u>Christian</u> chose to close Rader (max secure).  Christian made that decision,

knowing that incidents like this were going to happen, as COJC was not equipped to lock

youth down or otherwise handle the worst of the worst offenders.  "[COJC] looks like a day

camp."  "It's a place that houses the worst of the worst [] with a fence around it."

Stewart did not work at COJC.  And, as Christian and others admitted, handling

security, COJC's day-to-day operations, and hiring/training its staff were <u>not</u> Stewart's

obligation, but that of Moriarty, his staff and OJA's White male Training Officer.  Christian

solely had the power to fill jobs.  He knew COJC was understaffed, but exercised "great

control" in limiting the approval of filling vacant jobs which created problems at COJC.

Adding to the suspiciousness is that <u>after</u> the 8/4/11 assault, Christian signed Stewart's

PMP, noting her performance was satisfactory and mentioning nothing of the assault.  No

COJC employees were found to have failed in the performance of their duties over the assault

and no one could point to anything Stewart, who worked at State office, could have done to

prevent it, though Christian *now* claims that he holds Stewart responsible.

Christian's decision to close Rader also created problems with gang-related violence

at COJC.  Within one month of the last youth transferring out of Rader, OJA's Board was

---

[8]*See Simms v. Oklahoma ex rel., Dep't of Mental Health & Substance Abuse Serv.*,
165 F.3d 1321, 1328 (10th Cir. 1999)(pretext may include use of subjective criteria).

discussing how to control this gang problem at COJC.  The gym event was gang-related.

And, Stewart did not have control over any of the decisions regarding closing Rader or

setting policy to deal with the new issues that <u>Christian</u> created.  Christian (not Stewart)

controlled policy-making for OJA.  And, again, Stewart was not charged with handling

COJC's security, its day-to-day operations, training its staff, or hiring its staff.

As a result, when asked what Stewart could have done to prevent the the gang-related

gym event, Christian offered nothing.  When asked generally what could have been done, he

testified the staff did not perform their tasks.  However, Christian's assessment is completely

*inconsistent* with OJA's findings in that there were no findings that staff did anything wrong.

And, though he now points to these two events as a basis for termination, when they

occurred, Christian did not find them significant enough to even discuss them with her.

As to the escape, when asked what Stewart could have done, Christian identified

nothing.  And, as set forth above, Stewart did not work at COJC, was not charged with

directing or training its staff in their duties, did not hire COJC staff, and did not have the

authority to create policy related to its staff's conduct.  OJA's investigative report related to

the escape did not point to any wrongdoing on the part of Stewart.  And, OJA's

investigations into the gym event and escape were not complete when Stewart was fired.

Moreover, Defendants' attempt to justify Stewart's termination over the fact that the

press reported these events is incredulous.  As admitted by a Board member, "It's real easy

to get bad press."[9]  OJA receives press all the time, including over Rader and the DOJ lawsuit

(though no one was fired) and over Christian's alleged "bid-rigging."  As Bolin admitted:

> The reality of it is, in an institution, you're always going to have those kinds
> of problems.  You do everything you can to avoid them, but the reality is, is
> that the juveniles that you're working with are going to create problems.  That's
> why they're there in first place. *** I would tell you that working in an
> institution is not a fun job, nor is it an easy job.  And how you can control
> people depends on policy and procedure and what you're allowed to do.  So
> we're all restricted in some way by those things. *** And we were [] under a
> consent decree over at Rader, so there were a lot of issues about what we could
> and what we could not do. And [Stewart] was under the same restraints...

Of further significance is the fact that these events were clearly the responsibility of

Moriarty and his staff.[10]  Moriarty and others testified that these events were common, that

Stewart was "far removed" from the events, and that she could not have done anything to

prevent them.  Yet, when Christian first met with Moriarty the day after the escape (knowing

of all 3 events), he did not fire Moriarty, but offered assistance to him moving forward.

Christian then approached Moriarty again (the same day) and did not fire Moriarty, but told

him "it looks like you are going to get a new division administrator."  This begs the question:

if Christian was going to fire Moriarty, why was he offering him assistance moving forward

and telling Moriarty he would be getting a new division administrator?  Rather, Christian

decided after-the-fact to use these events as a proffered basis to fire Stewart because he did

---

[9]Though Defendants claim that Stewart stated the reason for termination was bad
press, this is false.  Nowhere is this statement made in her deposition, let alone on pg 37.

[10]None of the COJC staff <u>directly</u> involved with these events were fired and only a
few involved in the escape (none in the assault or gym event) were even disciplined.

not want what he had inherited at the executive level - a strong Black female.

It was not until Moriarty raised the issue of his own resignation that Christian re-thought his plan and placed Moriarty on leave.  And, it was not until a few weeks later that Christian told Moriarty for the first time that he could resign - something Moriarty had already offered.  Consistent with Moriarty's testimony, Moriarty's PAF identifies "retirement" as the action requested and as the code/reason.  Yet, Stewart's PAF identifies "action requested" as "termination" and "action code/reason" as "resignation."  Even Moriarty questions Christian's true intent behind Stewart's firing.

Although Defendants claim that Stewart cannot point to others who were treated more favorably, this is not true.  Christian (White male) and Bolin (White male) were not fired despite admitted responsibility over COJC and these events.  Christian consistently claimed COJC staff should have performed their jobs.  Yet, Dave Olberding (White male), who was in charge of training staff, was not fired.

Moreover, Christian and Rader's Superintendents (Martin (White male), Gomez (Hispanic male) and Moriarty (White male)) were not disciplined over the significant issues surrounding Rader, its constant bad press, and its legal battle with the DOJ where Christian and Martin were named defendants.  Though Martin was Rader's Superintendent prior to and during the DOJ case, unlike the way Stewart was treated, Martin resigned to take another job with Christian singing his praise.  And, when Christian was accused of bid-rigging and caught up in the "bad press" over that scandal, again, nothing happened to him.

-25-

Furthermore, Christian replaced Stewart with Dick Parrish (White male).  And, since 2008, Stewart was the only Black Division Director at OJA and one of only three female Division Directors (Stewart, Kim Sardis and Shantha Varahan).  Christian inherited Stewart and Sardis.  None of the three work for OJA now; Christian replaced each with White males.  And, since Stewart's firing, there are no executive staff who are Black.

One of Christian's first actions taken as ED was to fire an upper-level female employee.  Christian also personally hired three White males to serve as OJA criminal investigators: Carey Rouse, Jimmy Richey, and Dusty Dowdle.  And, Christian placed Gomez (Hispanic male) and Moriarty (White male) over Rader; then Moriarty over COJC.

OJA employee Laura Broyles also witnessed racial issues with Christian in that he showed a total disregard for equal racial treatment for youth and to racial statistics concerning Black youth.  OJA also put on an inappropriate skit for its staff (with Christian present) where employees were mocking a person with a strong Indian accent.

And, Christian took no disciplinary action against his Executive Assistant after receiving complaints about her KKK story (including placing a noose around a person's neck who had painted his face black) at a Board retreat.  His lack of responsiveness to such an egregious racist story further supports the fact that Christian placed no significance on racism.  In fact, it is incredible that Defendants argue that Christian took into consideration that McLennan was "under some personal stress" as if this is somehow an excuse to disregard racism.  [Doc No. 29, at 25 and Def. Ex. 5, ¶5].  Along with his lack of response,

-26-

the fact that he would excuse a White employee's racism because she was "under some stress" adds nothing but further support for the fact that Christian favors White employees' racist behaviors over a Black employee's offense to the same.

Stewart is not the only person to experience gender discrimination at the hands of Gene Christian in the same time frame. Christian admittedly told a subordinate, Broyles, that she should sleep with a state legislator to get more funding for OJA. Christian's affidavit suggests that he saw no fault in his comment, but only apologized because she was offended. *See* Def. Ex. 5, ¶7. This attitude of acceptance of his behavior is further supported by his lack of concern with OJA presenting a highly inappropriate video to OJA staff, depicting women sitting at a bar where it appeared they were wearing no pants or a thong.

Like Stewart, Broyles was aware of Christian's lack of respect and value of women in the workplace. He excluded Broyles from decisions she should have been involved in, just as he did with Stewart. And, he paid Broyles less than her similarly situated male co-workers, not unlike Stewart. Particularly, although the State average for Stewart's level was $6,343.58 in 2007, she was earning $5,958.75. And, even with the market adjustment to $6,042.08, she was still earning significantly less than the average. And, Moriarty was earning $5,983.33 - about $50 less than Stewart who had broader responsibilities.

Although Christian denied gender discrimination in the Broyles matter (like here), an ALJ and the EEOC found otherwise, causing OJA to fall under EEOC oversight for three years. Despite this, Christian went unscathed. Given all of this, it is not surprising that

-27-

Christian placed no emphasis on making discrimination training mandatory, which it is not.

Christian's credibility is further in question by the fact that he led the Board to believe that Stewart worked at COJC. He also led many at OJA to believe that her termination was a Board decision, not his own. Even in his affidavit, he now claims "the Board was in agreement with the decision to remove Elizabeth Stewart." *See* Def's Ex. 5, ¶4. Not only is this false and inconsistent with his deposition testimony, but there was no discussion among the Board about removing Stewart. Deanna Hartley-Kelso never expressed to anyone that Stewart should be fired or relieved of duty. Rather, Board members testified that Christian simply notified the Board that Stewart had been fired.

OJA's sworn discovery response, identifying Bolin as a participant in the decision to fire Stewart, is also false. Bolin was not involved and would not have fired her. When he fought to keep her, Christian said, "It's the Board's decision and I don't have any opportunity to do anything else." This statement to Bolin was false as Christian (and the Board) admitted Christian was the sole decision-maker. And, these are not the first instances of Christian's honesty being called into question in that he was accused of bid-rigging in 2010/2011.

As such, Stewart has raised substantial doubt as to the legitimacy of Christian's proffered reason for termination. There is simply no credibility to his claim that, subjectively, he "believed" Stewart (who had 8 years of solid performance) should be fired over three events. All that is left is to make credibility determinations and weigh the

evidence which are jury functions.[11]  *Nguyen*, 2007 WL 1765518, at *7 (quoting *Stinnett v.*

*Safeway, Inc.*, 337 F.3d 1213, 1216 (10th Cir.2003)).

## III.   RETALIATION

Under the but-for standard applicable to retaliation claims, Stewart must show that her

complaint about the KKK story "made a difference" in her termination - <u>even if other factors</u>

<u>contributed to that decision</u>.  *See Jones v. Oklahoma City Pub. Sch.*, 617 F.3d 1273, 1277-78

(10th Cir. 2010)*; Jones v. Nordam Group, Inc.,* 2012 WL 4458379, *2 (10th Cir. Sept. 27,

2012).   Determining what "made a difference" requires delving into Christian's intent,

motive, and state of mind - questions of fact for the jury.  *See Pinkerton v. Colorado Dept.*

*of Transp.*, 563 F.3d 1052, 1066 (10th Cir.2009).

Here, there is no dispute that Stewart engaged in a protected act.  And, as shown

above, there is no question Stewart was fired.  Although a year passed from the time of her

complaint until termination, this does not bar her retaliation claim.  As stated in *Piercy v.*

*Maketa*, 480 F.3d 1192, 1198-99 (10th Cir. 2007), "the passage of time does not necessarily

bar a plaintiff's retaliation claim if *additional* evidence establishes the retaliatory motive."

Here, after Stewart complained of the KKK story, Christian excluded Stewart from

decisions that should have fallen within her purview, like meetings concerning where youth

were to be place when Rader closed.  And, Stewart is not the only OJA employee to suffer

---

[11]*See Romero v. Union Pac. R.R.*, 615 F.2d 1303, 1309 (10th Cir. 1980)(motive and
intent are "particularly inappropriate for summary judgment").

retaliation after complaining of discrimination.   When Broyles was pursuing her gender claim, she was excluded from meetings and co-workers were told not to speak to her.   This, in addition to the evidence of pretext set forth above, warrants denial of Defendant's Motion.


**IV.    STEWART'S DUE PROCESS CLAIMS**

*A.    Procedural Due Process (Property Interest)*

Although Defendants claim that Stewart was unclassified, Defendants fail to cite to any statute in support.   In fact, 74 O.S. § 840-5.5 identifies the plethora of positions that are "unclassified," but Stewart's job is not on that list.   And, 10A O.S. §2-7-202 designates OJA as a Merit System agency.   It appears Christian misclassified her.   If Stewart is not unclassified, then she was entitled to process (something she believed she was entitled to).

Defendants argue that Stewart received "due process" when Christian told her she could resign or be fired - albeit with no reason offered despite her request for one - and her employment status was placed on the agenda.   However, this is a far cry from "due process." Rather, Stewart received <u>no</u> process.   She was not given any reason for termination or an opportunity to be heard.   As such, a violation of Stewart's procedural due process rights has occurred.   *Greene v. Barrett*, 174 F.3d 1136, 1141 (10th Cir. 1999).

*B.    Substantive Due Process (Liberty Interest)*

For a substantive due oprocess claim, Stewart must show a statement: (1) impugned her good name or integrity; (2) was false; (3) foreclosed job options; and (4) was published.

*Stidham v. Peace Officer Standards and Training*, 265 F.3d 1144, 1153 (10th Cir.2001).

Here, Defendants published false comments that impugned Stewart's good name after she

was placed on leave.  Christiansen told the press that Stewart had "taken annual leave so that

legal issues can be addressed."  Defendants have pointed to no "legal issues" that OJA

addressed, nor were there any.  OJA also stated that she was relieved of duties, though she

was offered the option to resign which she did under duress to avoid the stigma of

termination.  However, Defendants' statements placed the stigma she was seeking to avoid

squarely on her.  The published statements were false, impugned her good name (after 8

years of solid performance with OJA), and foreclosed other job opportunities.  As such,

summary judgment is not appropriate as to this claim.

## V.    STEWART'S EQUAL PROTECTION CLAIM

There is no dispute the Equal Protection clause protects against gender and race

discrimination.  And, although Defendants argue about a class of one theory, Stewart is not

pursuing such a theory.  Rather, her Equal Protection claim is based on unlawful race and

gender discrimination which is analyzed in the same fashion as Title VII.  *See Floyd-Gimon*

*v. Univ. of Arkansas*, 716 1141, 1148 (8th Cir. 2013).  As shown above, Stewart was treated

differently than White males, warranting denail of summary judgment as to this claim..

## VI.   CHRISTIAN IS NOT ENTITLED TO QUALIFIED IMMUNITY

Here, Stewart must show: (1) the defendant's actions violated a constitutional right,

and (2) the right was clearly established at the time of the actions.  *Harlow v. Fitzgerald*, 457

U.S. 800, 818 (1982).  There is no question that Stewart's right to be free from gender and race discrimination under the Fourteenth Amendment had been clearly established long before 2006 when Christian became ED.  *See Washington v. Davis*, 426 U.S. 229, 239 (1976) (race); *Davis v. Passman*, 442 U.S. 228, 234 (1979)(sex).  Similarly, Stewart's due process rights were clearly established prior to Christian's arrival at OJA.  *See Cleveland Board of Educ. v. Loudermill*, 470 U.S. 532 (1985); *Bailey v. Kirk*, 777 F.2d 567 (10th Cir.1985).  As such, Christian is not entitled to qualified immunity.

## VII.   NEGLIGENT SUPERVISION, RETENTION AND TRAINING

Issues of negligence are not ordinarily susceptible to summary judgment; however, Stewart need only show: (a) Defendants had a duty to have in effect proper procedures to protect her from discrimination/retaliation; (b) they breached their duty; (c) Stewart suffered harm; and (d) the harm was proximately caused by such breach.[12]  *Murray v. Pizza Hut*, 92 F.3d 1996, *4 (10th Cir. 1996).  Here, OJA had the duty to train and supervise its staff to refrain from engaging in discrimination.  OJA failed to fulfill its duty as it failed to provide EEO training.  In fact, Christian placed no significance on EEO training.

During Christian's tenure, Heath's office investigated 4 to 5 EEO complaints per year, some involving gender/race and some substantiated.  OJA knew of Christian's propensity to discriminate based at least on gender due to Broyles' complaints, the ALJ's findings (issued October 2010), and the EEOC's findings.  Despite this, Christian went unsupervised and

---

[12]Defendants cite no authority showing this claim is not recognized in Oklahoma.

without discipline.  As such, summary judgment is not proper as to these claims.

## VIII.   BLACKLISTING CLAIM

Under 40 O.S. §172, Defendants cannot intentionally interfere with Stewart's job opportunities.  Defendants interfered with Stewart's job opportunities.  When she applies for jobs with the State, she has to state whether she has been fired or asked to resign from another state agency.  Based on her circumstances, she has to answer affirmatively.  Her understanding is that state agencies routinely confer about prospects.  And, despite her overwhelming qualifications, she has not been offered such jobs.  Moreover, intent is a jury determination. *See Romero*, 615 F.2d at 1309.

Defendants point to no evidence to show Stewart cannot establish this claim. They make references to testimony that was not given (i.e., Stewart did *not* admit there was no agreement to blacklist her or that Christian did not blacklist her).  Having failed to present any legal basis for the dismissal of this claim, it should proceed forward.

## IX.   DEFENDANTS ARE NOT ENTITLED TO ABSOLUTE IMMUNITY

Although Defendants claim Christian was sued "partly" in his official capacity, this is not true.  He was named in his *individual* capacity, and the State was not sued under §1983.  Hence, Defendants are not entitled to immunity.

## CONCLUSION

**WHEREFORE**, Defendants' summary judgment motion should be denied.

Respectfully submitted,

s/Jana B. Leonard
LEONARD & ASSOCIATES, P.L.L.C.
JANA B. LEONARD, OBA # 17844
EMILY VAN VOLKINBURG, OBA #31744
8265 S. WALKER
OKLAHOMA CITY, OK 73139
(405) 239-3800 Telephone
(405) 239-3801 Facsimile
leonardjb@leonardlaw.net

## CERTIFICATE OF SERVICE

This is to certify that on this 27th day of November, 2013, I electronically transmitted this document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Electronic Mail Notice List:        The following are those who are currently on the list to receive e-mail notices for this case.

Emily P Van Volkinburg   emilyv@leonardlaw.net, dorfflert@leonardlaw.net

Jana Beth Leonard   leonardjb@leonardlaw.net, dorfflert@leonardlaw.net

Lauren W Johnston   johnstonlw@leonardlaw.net

Susan E Werner   susan.werner@oag.ok.gov, docket@oag.ok.gov, susan.hanna@oag.ok.gov, tin.nguyen@oag.ok.gov

Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

(No manual recipients)

s/Jana B. Leonard